THE LATHROP CO., APPELLANT, *v.* CITY OF TOLEDO, APPELLEE.

[Cite as Lathrop Co. v. City of Toledo, 5 Ohio St. 2d 165.]

(No. 39416—Decided February 16, 1966.)

*Messrs. Shumaker, Loop & Kendrick, Mr. John W. Hackett, Jr.,* and *Mr. Carl V. Bruggeman,* for appellant.

*Mr. Louis R. Young,* director of law, *Mr. John J. Burkhart* and *Mr. James W. Proctor,* for appellee.

HERBERT, J.  The basic question presented here is whether Lathrop may recover for the extra work it performed.

Under section 19 of the contract, Lathrop was obligated to perform whatever extra work was ordered by the City.  Under section 12(c), the City promised to pay for the extra work at the contract rate.  However, the obligation to pay would attach only after certain restrictive conditions specified in the Toledo charter were met.  In brief, the charter required (1) a written order of the city manager as to what extra work was to be done, (2) an agreement in writing as to the cost of the work and material, and (3) a certificate of the city auditor that funds were available to pay for the extra work.  These conditions could only be fulfilled by the City.  All involved the co-operation of city officers.  As a matter of general contract law, if the promisor city were to make no promise, express or implied, to fulfill such a potestative condition precedent within its power, the general obligation to pay would be illusory.  However, "[i]t is very clear indeed that promissory words are not nullified by making the promise conditional on some event within the promisor's own power, if at the same time he impliedly promises to make reasonable effort to bring the event about * * *."  1 Corbin (1963), Contracts, Section 149.

However, the above potestative conditions did not make the bridge contract or the extra-work provisions illusory since section 19 of the contract shows that the city intended to fulfill the potestative conditions precedent to its obligation,

expressly assumed, to pay for the extra work it might order if it was obligated under the contract to do so.  It is our opinion that the city made an implied promise to fulfill the potestative conditions provided that it was contractually found obligated to pay for extra work.  Since the proviso takes the potestative conditions out of the power of the City and makes it dependent on the legal fact of contractual obligation to pay, the promise to pay is not illusory but binding.

Both parties realized that haggling over contract rights and obligations concerning extra work would defeat the City's desire to repair the bridge as soon as possible.  So the parties put themselves in the following contractual relation if extra work were to become necessary; Lathrop was to do whatever work the City ordered; the determination of rights and obligations was reserved until the completion of the work; and the City would pay its obligation and take the necessary steps under the charter to do so.

The City did not take those steps because it mistakenly believed that the guarantee clause of the contract placed the burden of the extra work on Lathrop.  We agree with the trial court's interpretation, in its charge to the jury, that Lathrop guaranteed not that the City's paint specifications were adequate but rather that it would follow the specifications given. It would be unreasonable to construe this provision to mean that Lathrop was the virtual insurer of the City's choice of paints.  Lathrop warranted only *its own* performance.  Moreover, since it was the City that selected the language of the guarantee clause, any doubt or ambiguity will be resolved in favor of Lathrop.  See, *e. g., Bellish* v. *C. I. T. Corp.* (1943), 142 Ohio St. 36, paragraph one of the syllabus; 3 Corbin, Contracts (1960), 262, Section 559.

Thus at the trial level, the complexity of the case had settled down to one fact issue—was the paint failure due to the City's specifications or was it due to Lathrop's workmanship.  The jury found that the City was at fault.

Thus the City learned that the extra work was not owed to it by Lathrop, and that, since it had ordered it and agreed to pay for it, it was faced with a contract obligation.

If the City had been a private party, the finding of a con-

172

tractual obligation would terminate this opinion. However, such a finding merely poses the issue: Although the City is obliged by contract law to fulfill the potestative conditions and pay its obligation, can the City assert its own breach of contract as a defense?

Many times this court has held that no recovery can be had on a contract that is entered into contrary to one or more of the legislated requirements. *State, ex rel. Baen,* v. *Yeatman, Aud.* (1872), 22 Ohio St. 546 (where contract was made in disregard of "competitive bidding" statutes, no recovery); *McCloud & Geigle* v. *City of Columbus* (1896), 54 Ohio St. 439 (where the statute prescribing the mode and time of advertising for bids was not complied with, no recovery on the contract); *City of Lancaster* v. *Miller* (1898), 58 Ohio St. 558 (where contract was made in complete disregard of statutes requiring competitive bidding and auditor's certificate that funds are available, no recovery); *Buchanan Bridge Co.* v. *Campbell et al., Commrs.* (1899), 60 Ohio St. 406 (where the contract was made in complete disregard of provisions requiring advertising of offer and competitive bidding, no recovery); *City of Findlay* v. *Pendleton and Whitely* (1900), 62 Ohio St. 80 (where contract for services was made without the auditor's certificate, no recovery, even though sufficient funds were available); *Pittinger* v. *City of Wellsville* (1907), 75 Ohio St. 508 (no recovery on a contract for personal services where contract was made without appropriation by city council and certification by auditor); *Frisbie Co.* v. *City of East Cleveland* (1918), 98 Ohio St. 266 (where contract was made in complete disregard of statutes requiring advertising and competitive bidding, no recovery); *State* v. *Kuhner & King* (1923), 107 Ohio St. 406 (state cannot recover money paid to contractor for performing a contract void from its inception because of failure to comply with the advertising statutes); *State, ex rel. Allen,* v. *Lutz, Aud.* (1924), 111 Ohio St. 333 (where statute puts an express limitation on amount of the debt that the government can incur, a contract for a larger amount is not enforceable beyond the limitation); *Pincelli* v. *Ohio Bridge Corp.* (1966), 5 Ohio St. 2d 41 (where contract was made in complete disregard of statutes requiring competitive bidding and an auditor's certificate, no recovery).

A thread running throughout the many cases the court has reviewed is that the contractor must ascertain whether the contract complies with the Constitution, statutes, charters, and ordinances so far as they are applicable. If he does not, he performs at his peril, e. g., *City of Wellston* v. *Morgan* (1901), 65 Ohio St. 219, paragraph four of the syllabus; *Frisbie Co.* v. *City of East Cleveland, supra,* paragraph five of the syllabus; *State, ex rel. Allen,* v. *Lutz, supra.* The most articulate explanation of this principle was given in *McCloud & Geigle* v. *City of Columbus, supra,* at 452 and 453, where the court, in referring to private contractors, said:

"We think there is no hardship in requiring them, and all other parties who undertake to deal with a municipal body in respect of public improvements, to investigate the subject and ascertain at their peril whether the preliminary steps leading up to contract and prescribed by statute have been taken. No high degree of vigilance is required of persons thus situated to learn the facts. They are dealing with public agencies whose powers are defined by law, and whose acts are public transactions, and they should be charged with knowledge of both. If the preliminary steps necessary to legalize a contract, have not been taken, they can withdraw from the transaction altogether, or delay until the steps are taken. The citizen and taxpayer, in most instances, unless directly affected by the improvement has but a remote, contingent and inappreciable pecuniary interest in the matter and should not be required to personally interest himself about its details. * * *
"* * *

"An occasional hardship may accrue to one who negligently fails to ascertain the authority vested in public agencies with whom he deals. In such instances, the loss should be ascribed to its true cause, the want of vigilance on the part of the sufferer, and statutes designed to protect the public should not be annulled for his benefit. * * *"

However, it must be emphasized that in the instant case the "preliminary steps" were taken; the general contract was entered into *in exact compliance* with the applicable laws. In each of the above cited cases, the contract was void *ab initio.* Here, there is a valid contract (1) which gave the city the power

to order whatever extra work it found necessary, (2) which obligated Lathrop to obey without any delay and (3) whereby the City assumed a *contract* duty to fulfill the conditions precedent to statutory and contract liability. Unlike the contractors in the above cases, Lathrop could *not* "withdraw from the transaction" or "delay until the steps" were "taken" *without being in breach of section 19 of the contract.* All through the history of this case, Lathrop has insisted that the City fulfill the conditions. But the City wrongfully (under a mistaken view of the guarantee clause) refused.

Thus Lathrop stands in a very different position from the contractors who in a long line of cases have failed to negotiate valid contracts. In our review of the cases, we have found only three cases in this state where a contractor who had made a valid contract has tried to recover for extra work.

In the first case, *Village of Carthage* v. *Diekmeier* (1909), 79 Ohio St. 323, the court held that where a contractor makes a valid contract complete with an auditor's certificate stating that a certain sum is available, and where the contractor then does extra work of his own volition which the city acquiesces in, there can be no recovery for the extra work. The extra work was done neither pursuant to the contract nor at the behest of the city. Such a volunteer, it was held, has no cause of action. We agree, for even apart from the restrictive statutes, a contrary result would have been insupportable.

In the second case, *City of Cincinnati* v. *Cameron* (1878), 33 Ohio St. 336, at page 364, there is a statement to the effect that where extra work is ordered by the city (but not in writing as required by law), where the contractor requests a written order, where the city refuses to give a written order since it is "unnecessary," and where the extra work is done as ordered, then the city is liable because the restrictive statute was designed to prevent fraud rather than cause it. That case, however, differs from the instant case in that the contract therein did not delineate the rights and duties of the parties in the event extra work became necessary. But even so, the court felt that a cause of action for extra work existed.

The third case, *City of Portsmouth* v. *Nicola Building Co.* (1922), 106 Ohio St. 550, involved a fact situation quite similar

to the one herein. A public-improvement contract was entered into, which complied with all statutory requirements. The contract delineated the rights and duties of the parties in the event extra work became necessary. The contractor was to do what the city ordered. The city would determine the extent of the extra work. The increase in cost was to be "in proportion" to the increase in work. A "supplementary contract" was to incorporate the extra-work particulars.

When extra work in fact became necessary, the city ordered the contractor to perform. However, the city refused to act further. The contractor performed and then sued for the extras. The city defended on the grounds that no supplementary contract had been executed, and that no auditor's certificate had been filed. The court held for the contractor, stating that the suit was on "the *original* contract itself," and that the statutory requirements need not be satisfied twice where extra work is done pursuant to the original and valid contract.

The City attempts to distinguish that case because the contract was a unit-price contract rather than, as here, a lump-sum contract. We do not perceive the significance of such a distinction. The rights of the contractor should not be frustrated because the contract failed to break down the lump-sum price into a price per square foot. The Director of Public Service for the city of Toledo testified that a unit price includes all costs and profits so that the unit price times the number of units equals the contract price. Since section 12(c) of the contract says that extra work "will be paid for at the same unit prices as bid," the contract did provide a standard by which the price for the extra work could be computed. Thus the *Nicola case* is controlling. Since Lathrop seeks to enforce the original contract, neither the provisions concerning a supplementary contract nor those concerning the charter requirements are material. To the same effect in other jurisdictions, see *Borough Construction Co.* v. *City of New York* (1910), 200 N. Y. 149, 93 N. E. 480; *Gearty* v. *Mayor of City of New York* (1902), 171 N. Y. 61, 63 N. E. 804. Judge Learned Hand provided a well reasoned statement of the law in *Todd Dry Dock Engineering & Repair Corp.* v. *City of New York* (1931), 54 F. 2d 490. For a review of the relevant cases in this area see

*M. DeMatteo Construction Co.* v. *Maine Turnpike Authority* (1960), 184 F. Supp. 907.

It is important to note that in this case the *Nicola* rule has the function of making specific enforcement of the contract unnecessary. If *Nicola* were inapplicable, Lathrop would still have its remedy. For Lathrop had the choice of either (1) compelling the specific performance of the contract and charter duties assumed by the City and *then* recovering in compliance with the charter or (2) seeking a direct recovery on the original contract under the *Nicola* rule. Either alternative was proper. In fact, when the *Nicola* rule makes the restrictive requirements inapplicable, a contractor has available an action in *quantum meruit*, for the only reason why this court has denied the common-law remedy of *quantum meruit* was to enforce the restrictive requirements by precluding their circumvention. See, *e. g.*, *City of Wellston* v. *Morgan, supra*. Thus, where the restrictive requirements have no application, neither should the rule denying a *quantum meruit* recovery. *Cessante ratione, cessat et ipsa lex*. Thus Lathrop had possibly three avenues to recovery. In denying all three, the Court of Appeals erred.

The practicalities of the business world often require a governmental body to enter into a flexible contract, one that is adaptable to future contingencies, unforeseen yet anticipated. A contrary ruling by this court today would have the effect of precluding this necessary power. The discerning reader of this case can see that but for the prior decision in *Nicola,* the bridge might not yet be painted. Ironically, the City argued that its powers were so limited that no order could be made without a temporally prior fulfillment of the conditions. Significantly, several of the older statutes required that the "auditor * * * *first* certify." Section 2702, Revised Statutes; Section 3806, General Code. However, the current provision, Section 5705.41 (D), Revised Code, read as a whole, does not take that restricted a view. Although the auditor's certificate is still a necessary condition precedent to *liability* where the provision is applicable, it is not a condition precedent to the *power* to act. This analysis views the statute as a means of protecting the public treasury rather than a restriction on governmental activity. In this way, the statute is construed according to its pur-

pose. In that light, we have also viewed the charter provisions involved in this case. The city of Toledo is thereby saved from the confining consequences of its position.

The judgment of the Court of Appeals is reversed, and that of the Court of Common Pleas is affirmed.

*Judgment reversed.*

ZIMMERMAN, MATTHIAS, O'NEILL and SCHNEIDER, JJ., concur.
TAFT, C. J., and BROWN, J., dissent.

TAFT, C. J., dissenting. In my opinion, Sections 225 to 229 of the Toledo Charter can not be avoided in the manner described by the majority opinion and as suggested by *City of Portsmouth* v. *Nicola Building Co.* (1922), 106 Ohio St. 550, 140 N. E. 174.

However, even if they might be so avoided, express provisions of the contract in the instant case would still require us to affirm the final judgment of the Court of Appeals for the city.

The contract consists of 75 typewritten pages. The first 18 pages represent a notice to bidders, including in pages 7 to 18 the general specifications of the contract. Sections 12 C, 17 and 19, which are quoted in part in the statement of facts and referred to in the majority opinion, are found among these general specifications. Page 19 is a copy of the plaintiff's proposal guarantee bond, pages 20 and 21 are the plaintiff's executed contract bond, pages 22 to 26 and page 31 are copies of the plaintiff's proposal, pages 32 to 36 are special provisions and supplemental conditions, and pages 37 to 75 are the drawings and specifications for this particular contract.

Pages 27, 28 and 29 are apparently the contracting portions of the contract, and the other portions are referred to in these contracting portions. These contracting portions contain the following provisions:

"Notwithstanding any other agreement or stipulation in this instrument, the city shall not be liable to the contractor for any sum in excess of the amount set forth in the certificate of the auditor attached to the contract, unless specifically authorized by the City Manager. Such authority to be effective, shall

178

be in writing, signed by the City Manager, and shall set forth the amount to be so paid and shall have attached thereto a certificate of the auditor showing that funds are available for such purpose.

"All provisions of this contract permitting the Director of Public Service to modify, alter, or change the contract or the plans and specifications, to adjust prices, or to order extra work, shall be construed as being subject to the written approval of the City Manager, and no liability shall be incurred by the city under any of such provisions until such written approval is first obtained."

After another short paragraph, appear the words "In witness whereof, the parties hereto have executed this contract as of the day and year first above written." Thereafter there appears execution of the contract by the City Manager on behalf of the city and by the president of plaintiff corporation on behalf of that corporation. This contracting portion of the contract is immediately followed by page 30 which constitutes the auditor's certificate.

In the instant case, recovery is being allowed for a "sum in excess of the amount set forth in the certificate of the auditor attached to the contract" although not "specifically authorized by the City Manager." Admittedly, there is no "writing, signed by the City Manager" authorizing such "amount to be so paid," and there is no additional "certificate of the auditor showing that funds are available for such purpose." Furthermore, there is admittedly no "written approval of the City Manager" with regard to the "extra work."

These express provisions of the contract, appearing immediately before the signature of the parties thereto, would seem clearly to bar the recovery sought by the plaintiff in the instant case.

BROWN, J., concurs in the foregoing dissenting opinion.